84 N.J. Super. 100 (1964)
201 A.2d 75
BOROUGH OF DEMAREST, PLAINTIFF-APPELLANT,
v.
FRED HECK AND MILDRED HECK, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 13, 1964.
Decided June 3, 1964.
*101 Before Judges GAULKIN, FOLEY and LEWIS.
Mr. William A. Fasolo argued the cause for appellant.
Mr. Francis A. McEntee argued the cause for respondents.
The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiff Borough of Demarest appeals from a judgment of the Superior Court, Chancery Division, denying injunctive relief from alleged violations of its zoning ordinance and the maintenance of an alleged nuisance. Defendants Fred Heck and Mildred Heck, his wife, own the subject property known as 147 County Road, Demarest. It consists of approximately 3.65 acres of land on which are located farm buildings that are at least 50 years old. Eighteen horses and three ponies are maintained on the premises.
The premises had been part of a farm situate in a district denominated residential. The 1922 zoning ordinance provided that in such districts:
"* * * no trades or industries, except the construction of one and two-family dwellings or accessory buildings and except the conducting of agricultural, horticultural or dairying business, shall hereafter be carried on, conducted or located, and no building * * * shall be hereafter located or constructed therein, to wit * * * Barns, stables or garages other than accessory buildings to one or two-family dwellings. * * *" (Emphasis supplied)
*102 In 1941 a new zoning ordinance was passed upgrading the district and limiting the area use to:
"Single, detached houses used as residence by not more than one family and accessory buildings necessary thereto. There shall not be more than one private garage as an accessory building."
Between the years 1916 and 1935 the property in litigation was a portion of a ten-acre parcel of land which had been owned and operated by Henry Ebbighausen as a general farm. The animals thereon included pigs, one cow and a plow horse. The farm was conveyed to a bank in 1935 and, thereafter, for three or four years, it remained idle and unoccupied. In February 1940 it was purchased by Albert Rossini and wife; they never lived on the premises but used the barns for stabling their horses. There was conflicting testimony between Rossini and his first caretaker, Anton Schuermann, as to the number of horses maintained on the property at the time the 1941 ordinance was adopted. It is clear, however, that after the successor caretaker, Dominick Furfero, took possession in 1942, additional horses were brought onto the premises for "boarding" purposes.
In 1945 Rossini subdivided the ten-acre tract and sold off portions thereof for the construction of dwelling houses, retaining ownership of the segment (approximately 3 1/2 acres) on which the farm buildings were located. In 1951 that residual area was sold by Rossini to his caretaker Furfero. There is evidence that during the period of the latter's occupancy the number of horse stalls in the farm buildings was increased to 26; at times all of the stalls were filled. After Furfero's death in 1959, his widow gradually discontinued the horse boarding business and, by October 1961 when the property was sold to the defendants, the number of horses had dwindled to one.
Defendant Fred Heck testified that he lives in Closter, a municipality adjoining Demarest. He is the building inspector and zoning officer of his home community. Although principally engaged in the building trade, he also owns a *103 horse stable in Closter and has been in the business of "training and owning" horses since he was 18 years of age. Upon acquisition of the Demarest property, Heck developed thereon a horse stabling business. He arranged for the dwelling to be tenanted by Mrs. Astrid Mans, whose eldest daughter was entrusted with the supervision of the stables, including the exercising and training of horses and the teaching of children to ride. The number of horses defendants maintained on the premises fluctuated. At the time of trial (June 1963), in addition to their two jumping horses, defendants boarded 16 horses and three ponies.
The commercial aspects of defendants' project are best described in the words of Mr. Heck who testified:
Direct examination:
"Q. Would you describe to the Court exactly the nature of your operation here with the horses, what you do and what the people do?
A. About all we do is maintain horses. We do not hire any horses to anybody. We buy and sell horses. I have done that since I was a kid. * * *
Q. What is the nature of their riding activities? When do they arrive to start riding?
A. Fifty per cent of the horses that are there are owned by teenagers, and they generally ride after school. And the other horses that are there are generally ridden weekends, because they are mostly owned by businessmen, and they have no other time to use them."
Further, under cross-examination:
"Q. Who runs the stables in Demarest?
A. Mrs. Man's daughter. * * *
Q. How often do you go there? A. Every day. * * *
Q. When do you go, in the morning?
A. I go in the morning and I go at night. And I also go during the day if the occasion arises. I am always available. * * *
Q. Do you get any gain at all out of operating the stable up there? A. From the boarders, yes. * * *
Q. So that you are operating a business there, are you not? A. That's right."
The pending litigation was precipitated by a series of complaints which had been registered by local citizens with the police department and the municipal officials.
*104 Five neighbors testified for plaintiff. They characterized defendants' property use as a horse boarding and training enterprise, with attendant offensiveness and discomfort to the families living in the immediate vicinity. For the most part their proffered evidence related to and reflected protestations concerning stable odors and stench from manure; breeding of horse flies and rats; annoying dust, "terrific" when there is "violent riding"; disturbing noises caused by the horses, also by children "hollering" and "screaming" and by the blowing of automobile horns; illumination of the barns and excessive light from cars at nighttime; traffic congestion and hazards in the evenings and on Saturdays and Sundays; unsupervised activities; occasional destruction of property when horses break loose; and week-end equestrian functions which were likened to a rodeo. The proofs indicated the residential character of the neighborhood. Some of the neighboring ranch homes were described by one witness as "$35,000 homes more or less either way."
The defense witnesses included Heck, Rossini, Schuermann, Mans, a veterinary doctor and a customer who lived in Tenafly. Their testimony emphasized the orderly management of defendants' business, the prevalence of reasonably sanitary conditions and a general minimization or denial of the asserted elements of offensiveness.
The trial judge, in rendering his decision, expressed the opinion that the stabling and boarding of horses "is a form of farming and was incidental to such occupation from the earliest times" (citing Stout v. Mitschele, 135 N.J.L. 406, 409 (Sup. Ct. 1947)), and that the use of defendants' property is a continuance of a nonconforming use which "existed prior to the adoption of the 1922 ordinance and such use has remained unchanged to the present day." He also found that plaintiff's proofs did not establish the existence of a nuisance.
We have examined Stout v. Mitschele and find it to be unsupportive of the thesis upon which defendants claim a nonconforming use status. Involved in that case were 23 acres of farm land in a residential district which the Mitscheles *105 had been using, at the time of zoning, as a dairy (frequently having 50 cows and producing as much as 600 quarts of milk per day). When the owners discontinued the milk business, they engaged in the pursuit of raising and selling horses. The problem there posed was whether the farmer, when he found the dairying business unprofitable, could turn to the raising of horses and continue so doing because of his right to continue a nonconforming use. The court recognized that animal husbandry is an important adjunct to a farm and that the raising of horses, under the circumstances there present, was a form of farming. It was pointed out that the owner "conducts no horse auction or other business on the premises, but confines his activities to the raising of horses and the salvaging of the by-products which are taken from the premises for manufacturing purposes." Ibid.
The Hecks contend that the boarding and training of horses is an agricultural business which was allowable under the borough's 1922 zoning ordinance. They say such a use antedated the later and more restrictive ordinance and that, therefore, its continuation is protected by R.S. 40:55-48. The validity of that argument depends upon whether defendants' use can be lawfully classified as an agricultural business.
In their brief it is stated that research had failed to reveal any case citation in our jurisdiction defining "agriculture." We are cited to Black's Law Dictionary and also to Keeney v. Beasman, 169 Md. 582, 182 A. 566, 103 A.L.R. 1515 (Ct. App. 1936), for a reference from Virgil to indicate that agriculture includes the herding of cattle as well as the plowing of fields. Consequently, it is urged that the term "agricultural business," as employed in the municipal ordinance, comprehends the keeping and maintenance of horses.
While in this State there appears to be a dearth of reported decisions pertinent to the precise issue, we note that our State Board of Tax Appeals in Bonham & Young Co. v. Martin, 18 N.J. Misc. 129, 130, 11 A.2d 371, 372 (1940), in determining that the breeding and trapping of muskrats was "an agritural pursuit," adopted the definition of "agriculture" as *106 stated in Webster's New International Dictionary, i.e., "the art or science of cultivating the ground, including harvesting of crops and rearing and management of live stock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man * * *." Black's definition (4th ed. 1951) is substantially the same. The Oxford English Dictionary (vol. 1, 1933) traces the origin of the word to the Latin agri cultura, meaning tillage of the land, and defines "agriculture" as "The science and art of cultivating the soil; including the allied pursuits of gathering in the crops and rearing live stock; tillage, husbandry, farming (in the widest sense)." But, as Judge Learned Hand once declared, we do not "make a fortress out of the dictionary." Cabell v. Markham, 148 F.2d 737, 739 (2 Cir. 1945), affirmed 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Throughout literature and law, as well as the lexicons, agriculture has always been associated with two essentials, (1) the soil and undertakings incident to it, and (2) productivity. The test is whether the activity in a particular case is carried on as part of the agricultural function or is a separately organized and independent project. Note, Farmers Reservoir and Irrig. Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672 (1948), rehearing denied 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949); 3 Am. Jur.2d, Agriculture, § 1, p. 752 (1962). See also 3 C.J.S. Agriculture § 1, p. 365 (1936); 2 Metzenbaum, Law of Zoning (2d ed. 1955), c. X-p, pp. 1709 et seq.
Consistent with the foregoing concept is the opinion of Justice Heher in Berry v. Recorder's Court of West Orange, 124 N.J.L. 385, 389 (Sup. Ct. 1940), affirmed per curiam 125 N.J.L. 273 (E. & A. 1940), wherein it was held, "There is an evident essential difference between the devotion of lands to farming, with the incidental use of horses in furtherance of that purpose, and the conduct of a riding academy or stable, including as it does the hiring of saddle horses for use on the adjacent highways and bridle paths." In applying the test, we deal with the principle involved, and it is unnecessary *107 to make a technical distinction between agriculture and farming.
Further illustrations are to be found in the reported decisions in other states. We mention only a few. Chudnov v. Board of Appeals of Bloomfield, 113 Conn. 49, 154 A. 161 (Sup. Ct. Err. 1931) (the raising of poultry was considered unconnected with permissible farming activities in a residence zone); Town of Lincoln v. Murphy, 314 Mass. 16, 49 N.E.2d 453, 146 A.L.R. 1196 (Sup. Jud. Ct. 1943) (commercial hog raising not a farm within the meaning of the zoning bylaw); Pratt v. Building Inspector of Gloucester, 330 Mass. 344, 113 N.E.2d 816 (Sup. Jud. Ct. 1953) (stabling of two horses for show purposes and family pets was not within intent of zoning ordinance permitting farms in a residential district); Mioduszewski v. Town of Saugus, 337 Mass. 140, 148 N.E.2d 655 (Sup. Jud. Ct. 1958) (the breeding of racing dogs was not regarded as a use accessory to farming, as there was no farm use to which it could be accessory); Town of Mount Pleasant v. Van Tassell, 7 Misc.2d 643, 166 N.Y.S.2d 458 (Sup. Ct. 1957), affirmed 6 A.D.2d 880, 177 N.Y.S.2d 1010 (App. Div. 1958) (the maintenance of a piggery business on a 12-acre tract where no general tilling or substantial raising of crops was involved was held not to be farming as the term is generally understood).
In the case at bar Ebbighausen was operating a ten-acre farm when the borough was first zoned. His occupational use was within the exception, "agricultural, horticultural or dairying business." At that time there were stalls in the out-buildings for a cow and plow horse. It is not necessary for us to determine whether Rossini's use violated the 1922 ordinance. If his operations were the same as defendants', he too had violated the 1922 ordinance, and his operations did not create a nonconforming use as to the 1941 ordinance. The effect of the 1941 enactment was to continue and modify the 1922 ordinance, even though the latter was in terms simultaneously repealed.
*108 It is apparent that defendants are not farmers. They do not breed horses or live stock of any kind, do not raise crops or engage in any phase of land cultivation or kindred productivity commonly associated with the business of agriculture. There is no evidence of any such agricultural utilization of the property since Ebbighausen vacated the farm in 1935. The record makes it abundantly clear that defendants' property is devoted primarily to the commercial project of boarding and training horses for the accommodation of their customers. In effect, the owners are maintaining a hostel for horses which assumes characteristics of a livery stable and a riding academy rather than any aspect of an agricultural business.
The unquestioned proofs fix the character of the district as residential, and as far back as 1922 the governmental officials of Demarest sought through zoning to prevent uses discordant with the suitability of the restricted area. It is firmly settled in our law, by numerous authorities which need not here be cited, that the spirit of zoning is to view narrowly uses which claim protection as nonconforming. The design is to resolve all doubts against such claims. To hold that defendants' commercial venture, under all of the circumstances presented in the record, is an agricultural business would be inconsistent with those principles.
We are convinced that defendants' property is being used in violation of the borough's zoning ordinance and that the municipality had the right to seek and obtain the aid of the Chancery Division to prevent the continuation of such unlawful use. See Mayor and Council of Alpine Borough v. Brewster, 7 N.J. 42 (1951). Having reached the foregoing conclusion, it is unnecessary to review the trial court's determination on the issue of alleged nuisance.
The contention that plaintiff is guilty of laches and is estopped from maintaining an action for equitable relief is without merit. We find no manifest wrong or injustice that would warrant invoking the doctrine of estoppel against the governing body.
*109 The judgment is reversed, and the cause is remanded for the entry of judgment in favor of plaintiff consistent with this opinion.