Argued and submitted March 28, reversed as to CA 13860; reversed
and remanded with instructions as to CA 13859 May 27,
reconsideration denied July 10,
petition for review denied October 28, 1980 (290 Or 1)

LANE COUNTY,
*Appellant, Cross-Respondent,*
*v.*
BESSETT, et al,
*Respondents, Cross-Appellants.*

MOBILE CRUSHING CO., INC., et al,
*Respondents, Cross-Appellants,*
*v.*
LANE COUNTY, et al,
*Appellants, Cross-Respondents.*
(Consolidated cases)
(No. 78 1643, CA 13859) (No. 78 1644, CA 13860)
612 P2d 297

Margie Hendriksen, County Counsel, Lane County Office of Legal Counsel, Eugene, argued the cause and filed the briefs for appellants, cross-respondents.

Bruce H. Anderson, Eugene, argued the cause for respondents, cross-appellants. With him on the brief

were D. Michael Wells and Coons & Anderson, Eugene.

Scott M. Galenbeck, Springfield, filed a brief amicus curiae for Fall Creek Livability Group. With him on the briefs was Lively, Wiswall, Svoboda, Thorp & Dennett, Springfield.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

THORNTON, J.

## THORNTON, J.

The principal issue in these consolidated appeals is whether Mobile Crushing Co. (Mobile), the owner of a 171 acre parcel located in a farm-forestry zone (FF-20) in Lane County, has a right to operate a rock quarry on the property as a nonconforming use because quarry operations were conducted on the property by the United States Government, Mobile's predecessor in title.

The United States acquired the property in 1962 as a quarry site for the Army Corps of Engineers. The rock obtained from the quarry was used by the Corps in connection with the construction of Fall Creek Dam. The dam construction project was completed in 1965. In December of that year, Corps personnel initiated procedures to declare the property "excess" and to transfer the property to the United States General Services Administration (GSA) for disposal.

Effective November 12, 1975, Lane County zoned a district which included the Corps' property as FF-20. A quarry operation is not a permitted use in the zone. The zoning ordinance was amended in July, 1976, to correct an error in the description of the district.

Mobile's shareholders (the Bessetts) purchased the property from the United States in May, 1976.[1] The shareholders had submitted their bid for the purchase of the property to GSA, in response to an April, 1976, invitation for bids, which stated:

> "Information obtained from County offices indicates the site to be zoned as Farm Forestry 20. Bidders are urged to contact Lane County for specific allowances and limitations applicable to this zoning classification."

Upon acquiring the property, Mobile began quarry operations, which included rock crushing and removal of loose rock. Mobile and/or the Bessetts applied to the

---

[1] Shortly thereafter, the Bessetts apparently conveyed the property to the Mobile corporation.

county for a conditional use permit to conduct quarry operations on the property. The application was denied, but the quarry operations apparently continued.

Lane County brought suit in March, 1978, to enjoin Mobile from operating the quarry on the property. Mobile then brought suit against the county, contending through one cause of suit that Mobile enjoyed a nonconforming use right to conduct quarry operations because of the Corps of Engineers' use of the property as a quarry prior to the November, 1975, zoning; and contending through a second cause of suit that the 1975 zoning ordinance was not effective as to the property because the county had no authority to zone federally-owned land. Mobile sought an injunction against the county's interference with or prohibition of its quarry operations. The county successfully demurred to the second cause of suit on the ground that Mobile could not claim the federal government's immunity from county zoning. The county's defense to Mobile's first cause of suit was, generally, that the Corps had ceased using the property for quarry operations before the November 12, 1975, zoning ordinance took effect, and that no quarry activities were taking place on the property on that date.

The county's and Mobile's suits were consolidated for trial. The trial court found that there was a nonconforming quarry use by the Corps which predated the zoning of the property and which had not been discontinued. The court's decrees in the respective suits denied the relief sought by the county and granted the relief sought by Mobile. We review *de novo,* and reverse.

On appeal, the county makes three arguments: first, that Mobile cannot claim successorship to a nonconforming use by reason of the federal government's previous operations, because those operations were immune from county regulation and were therefore not "nonconforming," since the county could not have

required that the federal government "conform"; second, that the Corps of Engineers had abandoned the quarry use prior to the November, 1975, zoning of the property; and third, that Mobile failed to prove that a nonconforming quarry use was occurring on the property at the time it was zoned.

Mobile makes three "assignments of error" through its "cross appeal." *Cf. Artman v. Ray,* 263 Or 529, 533, 501 P2d 63, 502 P2d 1376 (1972). Mobile contends first that the trial court erred by sustaining the county's demurrer to Mobile's second cause of suit, because the county was prohibited from zoning federally-owned property by former ORS 215.130(3),[2] and that the property was therefore not legally zoned prior to the time Mobile acquired it. Mobile's second contention is that the trial court erred by not permitting Mobile to amend its pleading to conform to its proof, the point being, according to Mobile, that Mobile proved that the property was unzoned at the time Mobile purchased it, as well as in November, 1975, because the error in the description of the zoning district in the 1975 ordinance made that attempt to zone the property ineffective. Finally, Mobile argues that it was error for the trial court to deny Mobile's motion to reopen its case to put on the testimony of two additional witnesses.

Mobile had the burden of proving that a nonconforming quarry use existed as of the time the property was zoned. *Clackamas County v. Holmes,* 11 Or App 1, 9, 501 P2d 333 (1972), *reversed* 265 Or 193, 508 P2d 190 (1973); former ORS 215.130(4);[3] *cf. Parks v.*

---

[2] Former ORS 215.130(3) provided, at the time the zoning ordinance became effective on November 12, 1975:

"Ordinances adopted under ORS 215.010 to 215.190 and 215.402 to 215.422 may apply to state, school district and other publicly owned or occupied property, *except property of the United States.*" (Emphasis supplied.)

[3] Former ORS 215.130(4) provided:

"The lawful use of any building, structure or land at the time of the enactment of any zoning regulation or amendment thereto, may be continued as such although not in conformity with the zoning regula-

*Tillamook Co. Comm./Spliid,* 11 Or App 177, 197, 501 P2d 85 (1972), *rev den* (1973). The county does not dispute that the Corps of Engineers was conducting quarry operations on the property during the construction of the dam. The parties disagree whether the Corps of Engineers continued the use after 1965. During the 1962 to 1965 construction period, the Corps' operations included blasting and crushing of rock, and approximately 2.5 million cubic yards of rock were taken from the quarry. The operations were conducted on a regular daily basis, and sometimes on an around-the-clock basis.

The principal factual issue is whether and to what extent quarry operations took place on the property after the dam was completed and after the Corps of Engineers had initiated the process which, ten years later, culminated in the sale of the property to the Bessetts. Mobile's strongest evidence of a continuing quarry use after 1965 was the combination of the testimony of Mr. DuRett, who, according to his testimony, performed various services for the Corps, including the hauling of loose rock from the quarry for various projects which were undertaken at times he could not specifically identify between 1968 and 1975; and the testimony of Mr. Maxwell, a consulting engineer, who calculated that 16,652.8 cubic yards of loose rock were taken from the quarry in connection with the projects about which DuRett testified. Maxwell's calculations were based upon DuRett's testimony, and upon his own examination of the rock at the project sites and at the quarry. DuRett's testimony that the quarry site was the source of the rock for the projects was contradicted in many particulars by the testimony of Mr. Mendenhall, the Corps of Engineers' project director for the upper Willamette Valley. For

tion, but such nonconforming uses shall not be increased, changed or resumed after a period of interruption or abandonment except in conformity with such provisions as the zoning regulations may provide."

purposes of this opinion, however, we assume *arguendo* the correctness of DuRett's testimony.

There was some additional evidence relating to the removal of loose rock from the quarry after 1965. For example, DuRett testified that, in addition to the Corps of Engineers projects, some rock removal was undertaken by Lane County in the post-1965 period. However, the most certain evidence of use of rock from the quarry after 1965 was the documented fact that 75 cubic yards of loose rock were removed by the Corps of Engineers in 1975, after the Corps had requested and GSA had given its approval for that removal. It is noteworthy that the Corps considered GSA approval to be necessary to remove rock in 1975, and that there is no evidence that any other requests for removal of rock were made by the Corps to GSA.

There is no evidence—and Mobile does not contend—that any quarry activities other than removal of loose rock (i.e., blasting or crushing) were conducted by the Corps on the property after the dam construction project was completed.

Mobile presented *no* evidence to specifically identify when, between 1965 and the zoning of the property on November 12, 1975, the removal of loose rock about which DuRett testified took place. *See* former ORS 215.130(4), quoted *supra,* n 3. It is reasonably clear from the record, however, that the preponderance of any such rock removal occurred long before November 12, 1975. According to Maxwell, one project described by DuRett, the use of rock for the installation of a piezometer network, accounted for 11,908 of the 16,652.8 cubic yards Maxwell testified had been removed from the quarry. Mendenhall testified that the piezometer installation took place before he became project director in 1971. A nearby resident, Mr. Davis, testified that that installation occurred approximately two years after the construction of the dam.

In sum, even viewing Mobile's evidence most favorably to it, there was a quantum diminution in the

amount and nature of the Corps' operations on the property after the dam was completed. Blasting and crushing ceased completely; the volume of rock removed decreased from 2.5 million cubic yards during the period of construction to 16,652.8 cubic yards for the ten year period thereafter; and the regular daily operations which took place during construction declined to a maximum work total of 3,000 truckloads of rock hauled from the quarry site by the Corps during the 10 years from the time the dam construction was completed to the time the property was zoned.

Mobile argues that quarry operations are by their nature sporadic, and a discontinuance or abandonment cannot be inferred from the mere fact blasting and crushing cease after large stockpiles of loose rock have accumulated, or from fluctuations in the volume of extractions or sales. *See* 2 Anderson, American Law of Zoning 2d, § 15.67 (1968). While we agree with that concept in the abstract, we do not agree with any implication by Mobile—if such is intended—that a quarry use *cannot* be abandoned.

Both parties rely on *Bither v. Baker Rock Crushing,* 249 Or 640, 438 P2d 988, 440 P2d 368 (1968). There, the defendant had conducted a small quarry operation prior to the zoning of its property in 1961. From 1963 to 1965, the defendant substantially increased the nature and volume of quarry activities and

> " * * * caused dynamite explosions which produced violent concussion, vibration from noisy and powerful rock crushing machinery, fumes, and deposit of dust * * *." 249 Or at 658.

Thereafter, blasting and crushing were discontinued, and the plaintiff claimed that the use had been abandoned. The court disagreed, stating:

> " * * * However, the evidence does not clearly support the finding that the rock quarry was discontinued or interrupted. Extensive crushed rock was stockpiled before the explosions and crushing stopped in May 1965. Sales of rock continued, and Mr. Baker

testified that he had an intention of continuing the operation. There was no evidence to the contrary, except that crushing of rock ceased for a substantial period of time. This was not discontinuance of the business." 249 Or at 649.[4]

The facts here differ from those in *Bither.* In that case, the discontinuance of types of quarry activities (i.e., blasting and crushing) was held to be insufficient to prove discontinuance of the quarry use itself, in light of the evidence that there were ongoing sales and of the owner's intention to conduct quarry operations in the future. In this case, there is no persuasive evidence that the Corps intended the continuation of quarry operations on the site after it completed the Fall Creek Dam in 1965. Procedures for disposal of the property were initiated by the Corps in December of that year. Moreover, as earlier indicated, there was no proof of any cognizable amount of rock removed from the quarry site by the Corps of Engineers on the date the property was zoned or during the relatively proximate preceding period (whether or not the total amount of activity which DuRett testified took place *sometime* between 1968 and 1975 would be a cognizable amount if all of it took place shortly before zoning). The quarry activity which was occurring at the time of zoning, as far as the evidence shows, was no more than an incidental use of property which had been declared excess and was awaiting sale. *See Clackamas Co. v. Port. City Temple,* 13 Or App 459, 511 P2d 412, *rev den* (1973). The only quarry operation which the evidence conclusively shows occurred in 1975 was the removal of the 75 cubic yards of rock which the Corps had sought and obtained GSA approval to remove. We find that Mobile failed to prove that there was an existing quarry use of the property when the zoning ordinance became effective on November 12, 1975.

---

[4] Nevertheless, the court held that any quarry activities which exceeded those carried on as of the time of zoning could properly be enjoined. *See* former ORS 215.130(4) (quoted supra, n 3). *Cf Parks v. Tillamook Co. Comm./Spliid, supra,* 11 Or App at 197.

Mobile argues, however, that under former ORS 215.130(3) the county had no authority to zone the property on November 12, 1975, and therefore the property was unzoned when Mobile acquired it and the quarry use was not prohibited. Former ORS 215.130(3) provided:

"Ordinances adopted under ORS 215.010 to 215.190 and 215.402 to 215.422 may apply to state, school district and other publicly owned or occupied property, *except property of the United States.*" (Emphasis supplied.)

The county argues:

"ORS 215.130 did not say that Counties could not *zone* Federal properties. It stated that the ordinances could not be *applied* to them. There is quite a difference between the two concepts. It would be contrary to the State interest in land use planning to forbid the zoning of property in Federal ownership, since the Federal government is constantly disposing of its property to private parties. It would be ridiculous to say that the local government bodies throughout the State had to be constantly checking for every individual Federal sales of property to private parties so that they could rush in and zone the property before it changed hands. It makes far more sense that the local jurisdiction can zone all property within its jurisdiction, even though it can't enforce its zoning while the property is under Federal ownership. It can enforce it, however, when property is transferred to a private party. * * *" (Emphasis in original.)

Neither party cites authority which bears on whether former ORS 215.130(3) prohibited counties from designating the zoning classifications of federally-owned property, or prohibited them only from regulating the use of land by the federal government.

We find the county's argument persuasive. In light of the relevant statutes in effect on November 12, 1975, it is highly unlikely that the legislature intended to prevent counties from including all land within the ambit of their *geographical* planning authority in their comprehensive plans, maps and zoning and other

[328]

land use ordinances. The "exemption" of federal property under former ORS 215.130(3) is logical if understood as a recognition by the legislature of the immunity of federal *activity* from local control—to the extent such immunity existed. *See, e.g.,* 2 Anderson, *supra,* § 12.07. It is correspondingly illogical to view the "exemption" as requiring counties to make planning and zoning decisions on a completely ad hoc basis, as would be the case if comprehensive planning and zoning became applicable or inapplicable to *territory* as it passed out of or into federal ownership. We conclude that former ORS 214.130(3) did not prohibit the county from zoning the property.

Mobile next argues that the November 12, 1975, zoning of the property was ineffective, because there was an error in the November, 1975, ordinance's description of the district encompassing the property. The error occurs in a long metes and bounds description of a large amount of land; the location of the error is approximately four miles from Mobile's property. However, Mobile argues that, as a result of the error, the description does not "close," and that the ordinance therefore does not satisfy the rule expressed in *Lane County v. Heintz Const. Co., et al,* 228 Or 152, 364 P2d 627 (1961),

> " * * * 'that an ordinance must be sufficiently certain as to the place or area of its operation so that persons subject to it will know its provisions and when they violate it.' * * *." 228 Or at 162-63.

The ordinance in *Heintz* was found not to satisfy that rule because it did not specify that the property owner's land was being zoned at all, or what zoning classification was being attached to it.

In the present case, Mobile was informed by the Corps of Engineers' invitation for bids that the property was zoned FF-20; Mobile applied for a conditional use permit to operate the quarry in the zone; and Mobile alleged in its second cause of suit, before learning during the course of the trial court proceedings about the error in the description, that

[329]

"[t]he subject real property and the rock quarry located thereon are situated in a larger area of Lane County that has been zoned by respondent, Lane County, on a permanent basis since November, 1975, as a farm-forestry 20 acre minimum district (FF-20) * * *."

Our decision in *Washington Co. v. Stearns,* 3 Or App 366, 474 P2d 360 (1970), is more apposite to the present facts than *Heintz.* We stated in *Stearns:*

"Defendant complains that interlineations and other irregularities in the ordinance make it vague. Our inspection of the ordinance and maps discloses nothing of this sort in any part affecting defendant's land. In *Vedovell v. City of Northlake,* 22 Ill2d 611, 177 NE2d 124 (1961), an ordinance was held valid as to the plaintiff who had knowledge of the zone in which his property was located, although the zoning map was absent altogether:

"' * * * Certainly in so far as plaintiff's property was concerned, no ambiguity was shown to exist and no injury or prejudice was suffered by the plaintiff by reason of the absence of a zoning map * * *.' 22 Ill2d at 615." 3 Or App at 371.

Mobile's final argument is that the trial court erred by denying Mobile's motion to reopen its case to put on the testimony of two additional witnesses. According to the affidavit of Mobile's counsel, the first of the witnesses would have testified that he participated in one of the post-1965 projects for which Mobile contended the Corps of Engineers' quarry was the rock source, that the rock for the project did in fact come from the quarry, and that the project was carried out in 1968. For reasons earlier stated, Mobile would not have been aided by demonstrating that rock was taken from the quarry seven years before the property was zoned.

According to counsel's affidavit, the second witness would have rebutted testimony by Mendenhall that the quarry was probably not the "source of rock for the *1975* widening of the entrance road to the lookout point dam project office." (Emphasis supplied.) Given our view of the case, the only possible importance that

rebuttal testimony could have had would be any bearing it might have on whether and how much rock was removed from the quarry shortly before the property was zoned. However, Mendenhall did not state in the testimony, which according to the affidavit Mobile's witness would have rebutted, that the road widening occurred in 1975. He testified:

'Q [by attorney for Lane County] Okay. I'm going to show you a picture that's been marked Defendants' Exhibit HH. Do you recognize that?

"A Yes, it's the entrance road to the project at Lookout.

"Q Were there any improvements made to that road while you were project engineer?

"A Yes, in *'72 or '73,* I think we widened that road." (Emphasis supplied.)

The affidavit does not suggest that Mobile's witness would refute Mendenhall's testimony regarding when the road widening took place, but would only rebut Mendenhall's opinion concerning the source of the rock used in the road widening project.

Conceivably, counsel's affidavit inadvertently referred to the widening of the entrance road to the Lookout Point Dam project office, but intended to refer to the Corps' projects at the boat ramp and parking lot area at Lookout Point. Mendenhall testified that the 75 cubic yards of rock removed from the quarry with GSA approval in 1975 were used, among other things, for riprap in the ramp and parking lot area, but that the rock comprising the fill in that area had come from a source other than the quarry. DuRett had testified that the fill rock had been taken from the quarry, but he was unable to specify when the removal occurred. Mendenhall was also unable to testify from personal knowledge when the fill was placed. He speculated that the event took place in 1974 or 1975, stating:

"The riprap was definitely done in 1975. I can only surmise that the other job was finished soon before that."

We conclude that the weight of the testimony Mobile sought to reopen its case to put on would have been minimal, and that the trial court did not abuse its discretion by denying the motion to reopen.

The decree in case 13860 (trial court No. 78-1644) is reversed. The decree in case 13859 (trial court No. 78-1643) is reversed and remanded to the trial court with instructions to enter a decree granting the injunctive relief sought by the county.[5]

---

[5] Because of the basis for our decision, we do not reach the county's argument that Mobile could not acquire a right to a nonconforming use on the basis of the prior use by a federal instrumentality.